## UNITED STATES v. McNAMARA et al.
### No. 378.

Circuit Court of Appeals, Second Circuit.

July 12, 1937.

Walter Brower and David V. Cahill, Sp. Assts. to Atty. Gen. (Bernard Tompkins, Sp. Atty., Dept. of Justice, of New York City, of counsel), for the United States.

Eugene A. Sherpick, of New York City (Harold R. Medina and William Gilbert, both of New York City, of counsel), for appellant McNamara.

John W. Davis and Theodore Kiendl, both of New York City (Theodore Kiendl, of New York City, and Harold M. Kennedy, of Brooklyn, N. Y., of counsel), for appellant Manasseh Miller.

George Z. Medalie, of New York City (George Sylvester and George Z. Medalie, both of New York City, of counsel), for appellant Charles E. Warren.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

The indictment charged appellants in twenty-four counts with devising a scheme and artifice for obtaining money and property by means of false and fraudulent pretenses in connection with the sale of guaranteed first mortgages and guaranteed first mortgage certificates issued and sold by the National Title Guaranty Company and with using and causing the use of the United States mails in the accomplishment and execution of this scheme. The twenty-fifth count charges a conspiracy to use the mails in furtherance of the scheme to defraud. Appellants were convicted on the twenty-fifth count only.

The National Title Guaranty Company was organized in 1924 with a capitalization of $150,000, which was gradually increased until in 1929 the total stock issued was $3,039,900. By the New York statute it was under the supervision of the Insurance Department of New York, which in November, 1932, approved a reduction of the capital to $1,013,300. Its business consisted of searching and insuring titles to real estate and of guaranteeing real estate mortgages and mortgage certificates as to principal and interest.

Appellant Miller was one of its organizers, its president until February 10, 1932, and a member of the board of directors from organization until October, 1932. He was its counsel until the latter date. McNamara was a director throughout the existence of the corporation and at times treasurer, vice president, and, when Miller resigned, February 10, 1932, he became and remained its president. He was experienced in the real estate and mortgage business before his association with this corporation. Warren's connection with the corporation started in November, 1931, as a director, and later as vice president and treasurer and a member of the executive committee. He had been a real estate expert of many years' experience and a bank president. Warren assisted Miller and took over some of the latter's duties in December, 1931. All appellants were active participants in helping and making sales of mortgages and certificates.

The corporation prospered until the depression set in, and then, in common with all title and mortgage concerns, it felt its effect and suffered serious losses. Like other similar concerns, this corporation was taken over by the Insurance Department of the state August 2, 1933. Between October, 1929, and August 2, 1933, it carried on its business hoping that it might survive the financial stress and storm of the depression.

The crimes charged are based on alleged false and deceptive representations by means of which mortgages and certificates were sold to alleged victims. Appellants are said to have caused misleading advertisements, pamphlets, and financial statements to be circulated for the purpose of making sales. The representations in substance were that their mortgages and mortgage certificates gave the soundest form of investment. These mortgages and certificates were secured by liens on real estate backed by the guaranty of the corporation. Real estate values shrank severely and the guaranty of the corporation was affected by its losses and ultimately by the action of the State Superintendent of Insurance in undertaking its liquidation.

The judgment of conviction requires only a review of the conspiracy charge. The court's charge allowed the jury to find that on and after October 1, 1929, the appellants intentionally devised a scheme to defraud and consummated their fraud by certain overt acts. The instructions correctly advised the jury that the offense charged consisted of two elements: First, a scheme devised or intended to be devised to defraud; and, second, use of the mails in the execution or attempted execution of the scheme. In defining a scheme the jury was told that deliberate and express agreement was not necessary; it was not encumbent upon the Government to show that a round-table conference was held wherein a plan of action was formulated and the details of a plan were agreed upon; it would be sufficient if there was a "tacit agreement or concerted action." After all, the appellants were high officers of the company, they dictated its policies and its course of business. Any intentional combination on their

part, though not expressly agreed upon, to defraud the public would be sufficient. It was required, however, that the government should prove that the scheme or combination was wilful and intentional, that appellants deliberately worked together in the accomplishment or attempted accomplishment of a fraudulent purpose, and that overt acts were performed by one or more of the conspirators in furtherance of the common objective. A wrongful intent might be implied from the intentional doing of wrongful acts. On all these matters the jury was properly instructed.

The character of the business conducted by the corporation was adequately described to the jury. It dealt with real estate mortgages and guaranteed them to purchasers both as to principal and interest; the sales of the mortgages constituted the largest block of its transactions, but it also issued certificates which represented participations in single mortgages or groups of mortgages. The charge made against the appellants centers largely about the sales of these certificates. In 1932, for example, there were outstanding guarantees against whole mortgages in the sum of upwards of forty millions; there were outstanding certificates against whole mortgages of nearly two millions, and certificates issued against group mortgages aggregated only $107,000.

■ A charge of fraud is made in that condensed financial statements were issued in 1929 and 1930 which did not correctly reflect the condition of the corporation. There is no accusation of falsity, but it is contended that the statement did not go far enough in fully clarifying the character of the year-end financing with the Bank of Manhattan Company which was intended to reveal a liquid position which the company did not in fact possess. It is said that in the books of account of the corporation these transactions had been entered under incorrect captions. Under one caption showing "Contingent Liabilities" were noted "Special Guarantees," and after that in parenthesis were the words "Notes Payable." This represented loans from the Bank of Manhattan Company for which mortgages owned by the corporation were assigned as collateral. These loans were negotiated at the end of each year, for four years beginning with 1927, for the purpose of refinancing bank obligations. They were temporary in character, of several days' duration, repaid, and the mortgages reassigned to the corporation. The transaction did not pad the cash position of the company; the moneys which came from the Bank of Manhattan Company were deposited in the company's bank account and used to anticipate the loans had with other banks. The company did not have to pay these bank loans, but at the beginning of each year, having thus secured renewal of its credits from other banks, it carried out its repurchase agreement and took the mortgages back which had been assigned as collateral.

The entries so made were by the accountant but in 1930 Miller, as president of the corporation, asked its counsel's advice as to this method of representing the transaction and upon his advice it was changed that year. On the liability side there was set up the exact amount received from the Bank of Manhattan Company and the amount of guarantees was increased. A vice president of the bank testified that the sales of these mortgages, though made under a repurchase agreement, were actual and bona fide and that in the bank's ledger these transactions were carried in the mortgage account. Neither method of dealing with this accounting problem made any change in the net worth or in the financial responsibility of the corporation. Compare, Pelz v. United States, 54 F.(2d) 1001 (C.C. A.2). The corporation dealt with one of the principal banking institutions of the city. Particularly significant in its bearing on the question of a conspiracy to defraud is the fact that identical transactions were carried on in the company's most prosperous years. The evidence is inadequate to brand the transactions or the statements which reflected them as a fraud.

■ Undoubtedly from 1930, and particularly so from 1932, to the date the corporation was taken over by the insurance department, it was hard pressed to meet its guaranty obligations. The court below correctly stated to the jury that from the earlier year it began to show losses. That, however, does not justify the inference that it had become a financial bubble which was kept from bursting only by adroit and dishonest manipulations. It is common knowledge that when other investments had collapsed, the real estate market was looked upon as a more reliable—relatively at least—channel of investments for trustees and others. It is significant that the corporation continued to meet its guaranteed interest obligations until March

1, 1933, just prior to the date of the bank holiday.

But it is said that the conspiracy of which the appellants have been found guilty is supported by proof of a wilful and intentional scheme to wilfully and intentionally defraud. To support the conviction of conspiracy based upon a willful and intentional scheme to defraud, the government points to the alleged false and deceptive manner, amounting to fraudulent representations, by which the certificates and mortgages were sold to the investing public, to the fact that investments were advertised as the safest and soundest known to man, whereas in fact it is said they were secured by liens on property of the most doubtful value.

Criticism is made of the manner in which the corporation conducted its business through subsidiaries. It is a fact that this was done at a time when there were widespread defaults by mortgagors. In order to protect its investors, the corporation would buy in foreclosed properties and retain control over them through wholly owned subsidiaries. The trial judge said of this practice: "Not only was the method of handling the properties on which foreclosures had been had entirely legitimate, but in that connection the defendants exercised good judgment and a high degree of care."

But it is said that there was proof that after such foreclosures, the corporation issued new certificates backed by new mortgages which were put on its books at preforeclosure values. Aside from the testimony of Newman, which indeed is not clear, it is quite incontrovertibly established that a revaluation was always made in accordance with the practice of the company and that this left a sufficient margin between the value of the property and the amount of the new mortgage.

The government complains, with good reason perhaps, that the corporation should have clearly indicated the irresponsible financial character of the subsidiaries as independent entities and that the mortgages against which certificates were issued were upon properties acquired in foreclosure. That would undoubtedly have been a wiser and more commendable procedure. The question is, however, whether the method followed sufficiently established a criminal scheme to defraud. In this regard the trial court charged: "All of these transactions were fully recorded on the books of the defendant, National Title Guaranty Company, in so far as that company was involved in the advances in connection with the foreclosure, and were truly reflected in the reports to the Insurance Department of the State of New York, and in the condensed balance sheets of the Title Company. These transactions were legitimate and proper; there was nothing suspicious or irregular about them; they furnish no evidence of any scheme on the part of these defendants, or any one of them to defraud anybody. On the contrary, they evidence good business judgment and proper practice."

Three incidents or facts connected with the business of the company are advanced as proof of an intentional scheme to defraud: (a) The sale of certificates secured by foreclosed properties of which the Grimmer sale is an instance; (b) impairment of the guaranty fund; and (c) the sale of certificates against mortgages which were in arrears as to taxes.

■ Grimmer testified that early in 1929 his wife and he purchased a mortgage of $3,250 maturing in 1932. He asked for payment at maturity and carried on his negotiations with a subordinate of the company, one German, who told him that the owners of the mortgaged property were prepared to reduce the mortgage to $1,750 and attempted to persuade Grimmer to keep the mortgage at the reduced amount. Unsuccessful in this, German prevailed upon Grimmer to select a certificate in one of a series of mortgages (Series T) and an exchange was made for the balance unpaid of $1,750. The property secured by this Series T was in arrears of taxes and the certificate book bore a notation against any sales in that issue. Contrary to instructions not to sell any more certificates against this particular issue, a foreclosure having been started, this sale was made to Grimmer, the only one made in 1932. Manifestly this was sold in error. Two-thirds of the certificate was subsequently purchased by Miller and another in accordance with an arrangement satisfactory to Grimmer. It is not established that any of the appellants played any part in the original sale of the certificate. The principal use of this incident at the trial was to show that Miller had purchased the certificate because he feared the consequences of the sale. As described in summation, he wished to "buy off an investigation"—an explanation which was by no means established and which was indeed

quite thoroughly discredited. Manifestly, the ad hominem use of this incident, simply to shatter the reputation of Miller, was highly prejudicial.

As to the impairment of the Guaranty Fund—assuming there was an impairment, a fact which is disputed—its highly technical character, the conduct of the parties when the stop letter from the Superintendent of Insurance was received and the steps taken to reduce the capital stock so as to comply with the provisions of the law, all indicate a desire to abide by the law rather than to conspire to defraud.

■ In the latter part of 1931, the Guaranty Fund was thought to be impaired. The corporation, pursuant to section 173 of the Insurance Law of the State of New York (Consol.Laws, c. 28), was required to devote a sum not less than two-thirds of its paid-in capital to specified investments, which were known as the "Guarantee Fund." The purpose of this statute had been the subject of differences of opinion among title company officials but in March, 1932, shortly after McNamara became president, the auditors reported a possible impairment in this fund. Upon receipt of this information, appellants McNamara and Warren, of their own volition, called at the office of the Superintendent of Insurance and conferred with him on this matter. The superintendent recommended that the defect be cured by a reduction of the capital stock of the company and it was agreed to do so. But on March 31, 1932, the Superintendent of Insurance wrote a letter concerning the conference stating that action upon the request to reduce the capitalization would be withheld pending an examination of the affairs of the company which would be commenced as soon as feasible, and further stating that: "At the present time, your company's guaranty fund does not satisfy statutory requirements. Accordingly, pursuant to the provisions of section 173 of the Insurance Law, your company is directed not to issue any guaranty or policy of insurance until such condition is corrected."

Instructions were given by McNamara to the company's employees that until further notice no policies or certificates of any nature were to be written. The officers of the company, together with a former superintendent of banks of New York, visited the Superintendent of Insurance, and after assurances that the stockholders would consent to a reduction of the capital stock arrangements were made for the examiners to proceed at once. There is controverted proof on which we need not pass that the corporation was thereupon expressly authorized to resume its normal business. An examination by the Superintendent of Bank Examiners followed and was concluded on September 13th. The vitally important fact is that though the trial court received the letter in evidence it ruled with the utmost clarity that as a matter of law the Superintendent of Insurance had no legal right to send out a notice of this kind, a ruling which was adhered to throughout the trial and on the submission of the case to the jury. The letter was received solely on the theory that it was proof of notice to the appellants of the impairment of the fund. However, Government's counsel inquired of its so-called "victim" witnesses whether they knew at the time of their purchases that the insurance department of the state had in 1932 prohibited the company from issuing any further guaranties; to which they replied that they did not. These questions were properly objected to and the answers were erroneously received, for, as we have said, the Insurance Commissioner had no authority under the statute to prohibit the company from issuing further guaranties. While ostensibly attempting to prove knowledge of impairment—a fact which is not disputed—the questions in fact were designed to establish that the company had been prohibited by the Superintendent of Insurance from doing business and were doing so contrary to law. This testimony was highly prejudicial. Impairment of the fund was a statutory infirmity of the utmost formalism which was cured by the simple expedient of reducing the capital stock, all of which had little or no bearing upon the financial solidity and responsibility of the company. The appellants themselves called the infirmity to the superintendent's attention and requested the remedy, facts altogether inconsistent with an intent or scheme to defraud. Yet, throughout the trial undue and prejudicial advantage was taken of the putative stop letter.

■ Sales of certificates against mortgages in arrears occurred in 1932 and 1933. In both years cash sales of certificates were relatively small, though a considerable number of certificates were issued in exchange for other certificates and mortgages. The sale of certificates against mortgages in arrears amounted to $16,700 in 1932, and $6,900 in 1933. The trial court pointed out in

its charge that arrearages totaled only 2 per cent. of the face amount of outstanding mortgages—that, at a time when the national financial structure was collapsing. But it submitted to the jury the question whether nondisclosure of these arrearages constituted material misrepresentations on the part of the appellants. The question of materiality would, of course, have to be considered in the light of the conservative character of the company's valuations which might very well render negligible the impairment resulting from arrearages. We shall assume without deciding that this matter was properly submitted to the jury and that it permitted an inference of an intent to defraud, though hardly of a conspiracy so to do. Much was made of the fact that Miller sold his stock holdings in the corporation in 1931 and 1932 at substantial losses and the jury was permitted to determine the bearing of this evidence upon the existence of a scheme to defraud.

Finally, there is the question of the methods of advertising in which the corporation indulged. The trial court dealt with this matter in detail and concluded that much of what was said was either true or was mere opinion. We do not decide this matter. Unquestionably many of the advertisements tended to exaggerate and were anything but wise or conservative. Admittedly the corporation began seriously to feel the effects of the depression in March or April of 1931. Infirmity in its mortgage structure, because of widespread default by mortgagors, and in the soundness and solidity of its guaranty, perhaps should have dictated better judgment and a more conservative policy in the manner of effectuating its sales. There is the other side of the picture, however. In the face of general financial collapse, mortgage companies, which were among the last to feel the impact of the depression, were seeking to survive and to salvage the investments of their mortgage and certificate holders. Nowhere is the charge made that what the appellants did was done for personal profit. Interest obligations were met until March 1, 1933. And during 1932 the hope was entertained that the Reconstruction Finance Corporation would facilitate funds with which to tide the situation.

The charge which we are here reviewing is one of a wilful scheme to intentionally defraud. Proof advanced to establish this charge is met by contrary proof which leaves the question of the appellants' guilt in considerable doubt. In view of this it cannot be doubted that the use made of the testimony pertaining to the year-end financing transactions with the Bank of Manhattan Company, to the Grimmer incident, and to the stop letter by the Superintendent of Insurance was highly prejudicial. This, at least, constitutes reversible error. Moreover, there were the personal references to the appellants made in the course of the summation which were unquestionably inflammatory. Likewise exception was properly taken during summation to references made by counsel for the government to other mortgage companies which were by no means pertinent but were certainly inflammatory and prejudicial.

Judgments reversed.